*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LEONARD T. GLINSKI and BARBARA
GLINSKI,

UNPUBLISHED
April 30, 2019

Plaintiffs-Appellants,

v

No. 342046
Oakland Circuit Court
LC No. 2016-154440-NH

CARDIOVASCULAR CLINICAL
ASSOCIATES, PC and MARK A. RASAK, D.O.,

Defendants-Appellees.

Before: TUKEL, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

Plaintiffs, Leonard T. and Barbara Glinski, appeal as of right the trial court's order granting summary disposition in favor of defendants, Cardiovascular Clinical Associates, PC and Mark A. Rasak, D.O., pursuant to MCR 2.116(C)(10). We affirm.

## I. FACTS

This case arose from allegations of medical malpractice after plaintiff, Dr. Leonard Glinski, suffered a stroke on February 26, 2015. Dr. Glinski has a history of cardiac problems. In 1989, he had a heart attack and was treated at Garden City Hospital. Years later, on January 21, 2000, Glinksi was first treated by Dr. Rasak, a cardiologist working with Cardiovascular Clinical Associates, PC, who implanted an arterial stent. On May 7, 2009, Glinski experienced a transient ischemic attack (TIA) and was treated at Botsford Hospital. He was prescribed Plavix, an antiplatelet medication, and was again referred to Rasak, who placed another arterial stent on June 2, 2009.

In 2012, Glinski underwent an electrophysiology (EP) test to investigate whether he was experiencing atrial fibrillation (AFib).[1] The EP test produced an occurrence of AFib, and as a result Rasak prescribed Glinski an anticoagulant medication while he underwent additional tests. According to Rasak, however, Glinski strongly objected to the anticoagulant because it was expensive and was, in Glinski's opinion, "rat poison." Glinski took the anticoagulant for three to four months while undergoing further testing. Rasak determined that Glinski was having no additional occurrences of AFib. Rasak testified that based on the non-recurrence of the AFib, and taking into consideration Glinski's strong objection to the medication, Rasak stopped the anticoagulant and instead prescribed antiplatelet therapy. Rasak testified that he was not concerned about Glinski discontinuing the anticoagulant because the AFib had been an isolated episode, and that antiplatelet medication therefore was the optimal therapy.

On January 4, 2014, Glinski had a second TIA, and was treated at Garden City Hospital. Neurologist Anne Pawlak diagnosed plaintiff with vascular disease. In consultation with Rasak, Pawlak prescribed Aggrenox, another antiplatelet medication. On August 14, 2014, Rasak had Glinski undergo a "stress echo" test, which revealed no evidence of AFib.

Glinski saw Rasak on December 17, 2014, complaining of chest discomfort. Rasak testified that he recommended that Glinski undergo tests to verify that the existing medication was working to prevent exercise-induced AFib. According to Rasak, Glinski told him that he was leaving for Florida and would do the tests when he returned. After the December 17, 2014 appointment, Rasak stated in a letter to Glinski's physician as follows:

Assessment: Abnormal EKG, bruit, chest pain, other inferior wall/unspecified, ischemic heart disease, mixed hyperlipidemia, PVD, dizziness or lightheadedness, chest discomfort, pressure or tightness, obesity, dyspnea, palpitations, s/p PTCA, atherosclerotic heart disease, atrial fibrillation, paroxysmal[2], dyslipidemia, and hypertension.

Plan: Medications reviewed-patient brought a list. Aggressive risk factor modification, as always, has been strongly reinforced including careful control of cholesterol, blood pressure and diet activity level. We should follow NCEP guidelines regarding the patient's cholesterol. The patient should be on a low cholesterol, low sodium diet. Continue current cardiac medical regimen. Weight loss through diet and exercise. Bilateral Carotid Dopplers-lightheaded/dizzy/bruit, stress echocardiogram-chest pain/shortness of

---

[1] Atrial fibrillation is described as an irregular heartbeat that can increase the risk of stroke, heart failure, and other heart-related health problems. See Mayo Clinic, *Atrial fibrillation* <https://www.mayoclinic.org/disease-conditions/atrial-fibrillation/symptoms-causes/syc-20350624> (accessed March 29, 2019).

[2] Paroxysm is a fit, attack, or sudden increase or recurrence of symptoms. <https://www.merriam-webster.com/dictionary/paroxysm>.

breath/coronary artery disease, and **current cardiac medications for now. May change pending the cardiac testing**. (Emphasis added).

On January 30, 2015, while in Florida, Glinski discovered hematuria (blood in the urine), and contacted his urologist, Dr. Mark Arnkoff. Arnkoff advised Glinski to stop taking his antiplatelet medication and to return to Michigan for surgical procedures. The parties do not dispute that Arnkoff did not consult Rasak about discontinuing the antiplatelet medication, nor did he inform Rasak about the hematuria or the planned surgeries.[3] Glinski returned to Michigan and Arnkoff performed a cauterization procedure on February 5, 2015. Afterwards, Arnkoff recommended a second procedure known as transurethral resection of the prostate (TURP) to be performed two weeks later. Arnkoff instructed Glinski not to resume his antiplatelet medication until after the procedure. The TURP was performed on February 19, 2015, and on February 23, 2015, Arnkoff informed Glinski that he could resume taking his antiplatelet medication. On February 26, 2015, Glinski suffered a stroke, resulting in ongoing impairments.

Plaintiffs brought this action, contending that Glinski's stroke and resulting impairments were caused by Rasak's failure to prescribe anticoagulation therapy for Glinski in 2014. During discovery, the parties deposed Dr. Daniel Wohlgelernter, a cardiologist who testified as an expert witness on behalf of plaintiffs. He testified that his opinion, as stated in the Affidavit of Merit, was that because Glinski had a history of AFib and TIAs, together with his age and health factors, he should have been prescribed anticoagulants in December 2014 to prevent a stroke. Wohlgelernter further testified that despite what Glinski's neurologist told Rasak after Glinski's TIA in 2014, Rasak should have made certain that Glinski was not experiencing AFib along with the vascular disease diagnosed by the neurologist because Glinski had a history of paroxysmal atrial fibrillation. Wohlgelernter conceded, however, that the only verified incident of AFib that Glinski had ever experienced was in 2012 during the EP test.

Wohlgelernter testified that if Glinski had been prescribed anticoagulants, he would have needed to discontinue the medication after developing gross hematuria. He further testified, however, that the need to discontinue the anticoagulants would have caused Arnkoff to consult with Rasak to assess the risk involved. Wohlgelernter opined that, despite the hematuria developed by Glinski in January 2015, it was likely that anticoagulation medication prescribed in December 2014 would have minimized the risk of stroke from AFib.

Dr. Louis Cannon, a cardiologist who was deposed by the parties as an expert witness on behalf of defendants, testified that when Rasak saw Glinski in December 2014, there was no evidence that Glinski had AFib and thus, Rasak had no reason to prescribe anticoagulants. Cannon testified that he, like Rasak, would have trusted the neurologist with Glinski's diagnosis and treatment of vascular disease after the January 2014 TIA. Cannon noted that Rasak ordered a "stress echo" test on August 14, 2014, which revealed no evidence of AFib. Cannon further testified that it is possible for an individual to have both vascular disease and AFib at the same time, and that either can cause a TIA. Cannon testified that in such a situation, he would be

_____

[3] Plaintiff Barbara Glinski testified that after Glinski developed hematuria while in Florida, he called Rasak and left a message. She did not know whether he eventually spoke with Rasak.

reluctant to put a patient on both antiplatelet and anticoagulation drugs because of the high risk of hemorrhage. He noted that Rasak ordered a second stress echo after Glinski's visit in December, which Cannon testified was reasonable given Glinski's continued complaints of chest pain despite the normal results of the first stress echo. Glinski, however, did not complete the ordered test.

According to Cannon, it was appropriate to take Glinski off of his antiplatelet medication when he developed hematuria in January 2015, and it would have been appropriate at that time to stop anticoagulant medication had it been prescribed. Both medications have blood-thinning properties and should not be taken by individuals experiencing bleeding. Cannon testified that because of the more serious nature of anticoagulants, however, it would have been appropriate to "bridge" anticoagulant medication had Glinski been taking it, to avoid the risk of stroke. However, Cannon did not believe that it would have been appropriate for Rasak to prescribe Glinski anticoagulants based upon the information available in December 2014.

Dr. Richard C. Davi, a urologist testifying on behalf of plaintiffs, testified that on occasion he oversees surgical or other procedures that conflict with anticoagulant or antiplatelet therapy. Davi testified that it would be inappropriate for a urologist to instruct someone with hematuria to discontinue their anticoagulant *or* antiplatelet treatment without contacting the prescribing physician because the treatments are outside the realm of a urologist's practice. However, while most urologists would not unilaterally discontinue antiplatelet therapy, a urologist absolutely would not discontinue a patient's anticoagulant medication without contacting the prescribing physician. Davi belived that if Glinski had been prescribed anticoagulants, Arnkoff would not have discontinued the medication without speaking with Rasak.

Dr. Frank Moser specializes in neuroradiology, and testified that, due to the blood thinning properties of anticoagulants and antiplatelet treatments, he would ordinarily instruct patients to discontinue use of the treatments if he were going to perform any type of invasive procedure. With anticoagulants, Moser generally bridges the treatments by putting the patients on Heparin until six hours before the procedure. Moser would then start the patients back on Heparin a few hours after the procedure before transitioning them back to the long-acting anticoagulant. Moser testified that he will stop the antiplatelet treatment unilaterally without contacting the prescribing physician. Moser opined that Glinski's stroke was "almost certainly" the result of AFib.

Defendants moved for summary disposition pursuant to MCR 2.116(C)(10), contending that plaintiffs had failed to establish causation between Glinski's injuries and any actions taken or not taken by defendants. The trial court granted defendants' motion, concluding that although a genuine issue of material fact existed as to whether Rasak breached the standard of care by not treating Glinski with anticoagulant medication in 2014, plaintiffs had failed to establish proximate cause, specifically, that the failure to prescribe anticoagulants was a but-for cause of the stroke. The trial court further found that even if causation had been established, Glinski's hematuria, which would have caused a "mandatory cessation of hypothetical anti-coagulation therapy," was an unforeseeable intervening cause. Plaintiffs now appeal to this Court.

II. DISCUSSION

-4-

## A.  STANDARD OF REVIEW

We review de novo a trial court's order granting summary disposition.  *Graham v Foster*, 500 Mich 23, 28; 893 NW2d 319 (2017).  When reviewing an order granting summary disposition under MCR 2.116(C)(10), this Court considers all documentary evidence submitted by the parties in the light most favorable to the nonmoving party.  *Dawoud v State Farm Mut Auto Ins Co*, 317 Mich App 517, 520; 895 NW2d 188 (2016).  Summary disposition under MCR 2.116(C)(10) is warranted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *Id*.  When a motion is made and supported under MCR 2.116(C)(10), the burden shifts to the nonmoving party to show, by affidavits or other documentary evidence, that there is a genuine issue of material fact.  MCR 2.116(G)(4); *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996).  If the nonmoving party does not make such a showing, summary disposition is properly granted.  *Id*. at 363.

## B.  CAUSATION

The trial court concluded that plaintiffs failed to create a genuine issue of material fact that Rasak's actions proximately caused Glinski's stroke.[4]  We agree.

A medical malpractice claim is one that arises during the course of a professional medical relationship and hinges upon a question of medical judgment.  *Lockwood v Mobile Med Response, Inc*, 293 Mich App 17, 23; 809 NW2d 403 (2011).  To establish medical malpractice, the plaintiff bears the burden of proving "(1) the applicable standard of care, (2) a breach of that standard by the defendant, (3) an injury, and (4) proximate causation between the alleged breach of duty and the injury."  *Rock v Crocker*, 499 Mich 247, 255; 884 NW2d 227 (2016).  Thus, a plaintiff must not only demonstrate that a defendant breached the applicable standard of care, the plaintiff must also demonstrate proximate causation of the plaintiff's alleged injuries from that breach.  See *id*. at 255.

" 'Proximate cause' is a legal term of art that incorporates both cause in fact and legal (or 'proximate') cause."  *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004).  A court is required to first determine whether a defendant's negligence was a cause in fact of the plaintiff's injuries before determining whether the defendant's negligence was the legal cause of those injuries.  *Ray v Swagger*, 501 Mich 52, 64; 903 NW2d 366 (2017).  To establish cause in fact, the plaintiff must present substantial evidence from which the jury could conclude that, but for the defendant's conduct, the plaintiff's injuries would not have occurred.  *Weymers v Khera*, 454 Mich 639, 647; 563 NW2d 647 (1997).  A plaintiff establishes cause in fact sufficient to create a genuine issue of material fact if the plaintiff establishes "a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support."  In a medical malpractice action, expert testimony is required to prove causation, as well as standard of care.  *Kalaj v Khan*, 295 Mich App 420, 429;

---

[4] The trial court concluded that there was a genuine issue of material fact that Rasak breached the standard of care by not treating Glinski with anticoagulant medication in December 2014.  Because this finding is not challenged on appeal, we decline to address it.

820 NW2d 223 (2012). However, the deposition testimony of an expert witness must still be read fairly and in context. See *Mate v Wolverine Mut Ins Co*, 233 Mich App 14, 21; 592 NW2d 379 (1999) (deposition testimony read in context did not raise a genuine issue of material fact). *Patrick v Turkelson*, 322 Mich App 595, 617; 913 NW2d 369 (2018) (quotation marks and citation omitted). "Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient." *McNeill-Marks v MidMichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016).

In this case, plaintiffs' evidence of causation is based entirely on speculation. Plaintiffs' theory is that if Rasak had prescribed anticoagulants in 2014, Glinski likely would still have experienced hematuria, and likely would have consulted a urologist, but the urologist likely would have consulted Rasak before discontinuing the anticoagulants, which likely would have led to Rasak prescribing a bridging anticoagulant during the surgical procedures, and then Glinski likely would have resumed the anticoagulant after the surgeries, and the anticoagulant likely would have prevented the stroke. This is a lengthy chain of causation, to say the least, and appears to involve more than a fair amount of speculation that each of these events would have occurred in the order listed.

Indeed, a review of the record indicates that the evidence does not support that scenario. Based on the evidence in the record that Glinski was strongly opposed to taking an anticoagulant, had Rasak prescribed an anticoagulant in 2014 without further evidence of AFib, it is by no means certain that Glinski would have consented to taking the medication. This is supported by the fact that when in December 2014 Rasak proposed further cardiac testing to determine if different medication was necessary, Glinski declined to undergo the tests at that time. Similarly, as the trial court noted, plaintiffs did not provide evidence that Arnkoff *would have* contacted Rasak about discontinuing Glinski's anticoagulation medication had Glinski been prescribed the same, only that it was likely that a urologist in that circumstance would do so. Davi, plaintiffs' expert urology witness, testified that a urologist should contact the cardiologist when discontinuing antiplatelet or anticoagulation medication. Because Arnkoff did not follow the expected protocol in discontinuing the antiplatelet medication in this case, it is not supported that he would have followed established protocol in plaintiffs' theoretical scenario.[5] Compounding this speculation is the further speculation that the anticoagulant would have been bridged successfully during the surgeries, that Glinski would have agreed to the eventual resumption of anticoagulants, and that the anticoagulants would have successfully averted the stroke.

---

[5] It is remarkable to say the least that Arnkoff failed to consult with Rasak before performing two surgical procedures on Glinski, despite Glinski's lengthy and complex cardiac history. This fact alone does not inspire confidence that he would have consulted with Rasak under different conditions, and it is speculative at best to say that he would have done so. Arnkoff did not advise Rasak he was performing not one but two surgeries on Rasak's patient, but Rasak is now held to account for the unfortunate outcome in this case. There would appear to be something wrong with that picture.

A plaintiff must prove that the defendant's act or omission was a cause of his injuries. *Craig*, 471 Mich at 87. "Mere speculation or conjecture is insufficient to establish reasonable inferences of causation." *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 140; 666 NW2d 186 (2003). It is not enough that a plaintiff demonstrate a mere possibility of causation, and an expert opinion regarding causation that is based only upon a hypothetical situation is not enough to demonstrate a valid causal connection between the alleged actions and the injury. *Teal v Prasad*, 283 Mich App 384, 394-395; 772 NW2d 57 (2009). In sum, "litigants do not have any right to submit an evidentiary record to the jury that would allow the jury to do nothing more than guess." *Skinner v Square D Co*, 445 Mich 153, 174; 516 NW2d 475 (1994), overruled in part on other grounds *Smith v Globe Life Ins Co*, 460 Mich 446, 455 n 2; 597 NW2d 28 (1999). Based on a review of the record, we conclude that the trial court correctly determined that defendants were entitled to summary disposition of plaintiffs' claim.

Affirmed.

/s/ Jonathan Tukel
/s/ Douglas B. Shapiro
/s/ Michael F. Gadola